IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | **8:17CR61** |
| vs. | | |
| SARA BAILEY, | | **FINDINGS AND RECOMMENDATION** |
| Defendant. | | |

This matter is before the Court on Defendant Sara Bailey's Motion to Suppress (Filing No. 25). Ms. Bailey is charged in a One Count Indictment with Interstate Travel or Transportation in Aid of Racketeering Enterprise (ITAR) in violation of 18 U.S.C. 1952(a)(l) & (a)(3). (Filing No. 1.) Ms. Bailey seeks to suppress all evidence obtained as a result of a traffic stop in Seward County, Nebraska on September 1, 2016. (Filing No. 25.)

The Court held an evidentiary hearing on June 1, 2017. Ms. Bailey was present with her attorneys, William Gallup and Thomas Olsen. The United States was represented by Assistant United States Attorney, Nancy Svoboda. The Court heard testimony of Nebraska State Patrol Trooper, Robert Pelster. The Court received into evidence Trooper Pelster's cruiser video (Exhibit 1). (*See* Filing No. 38.) A transcript (TR.) of the hearing was prepared and filed on June 12, 2017. **(**Filing No. 41.) This matter is now fully submitted and ready for decision.

**BACKGROUND**

At approximately 12:35 p.m. on September 1, 2016, Trooper Pelster was turning around in the median on Interstate 80, three miles west of Seward, Nebraska. (TR. 25.) At that time, Trooper Pelster observed Ms. Baily's vehicle traveling westbound in the passing lane. (TR. 27.) Trooper Pelster testified that Ms. Bailey did not do anything in particular to attract his attention, but that he was drawn to her vehicle because it was a $75,000 vehicle, had Utah plates, and appeared to be a rental. (TR. 27.) Trooper Pelster believed that the vehicle was a rental because it was brand new and a solid color. (TR. 27-28.) He also suspected it was a rental because it did

not have a plate bracket, dealership stickers, after-market tint, or after-market mud flaps.  (TR. 27-28.)  Trooper Pelster observed that Ms. Bailey was alone and slightly leaning back in the front seat.  (TR. 27-28.)  Trooper Pelster testified that as Ms. Bailey went by him, she glanced over and looked at his patrol car.  (TR. 29.)

Once Ms. Bailey passed him, Trooper Pelster pulled out of the median into traffic.  (TR. 29.)  Trooper Pelster testified that he had not observed Ms. Bailey commit a traffic infraction at that point, but wanted to pull behind her vehicle to watch her driving behavior.  He stated that as they continued to travel westbound, Ms. Bailey initiated a pass from the passing lane to the driving lane in front of a semi-truck.  (TR. 30.)  Trooper Pelster testified that it was not a safe pass because Ms. Bailey was only two car lengths in front of the semi when she switched lanes.  (TR. 30.)  Trooper Pelster testified that he likes to see two seconds between vehicles.  (TR. 31.)  Trooper Pelster stated that it was not safe for Ms. Bailey to pass and enter the semi's lane of travel because the applicable Nebraska statute governing the overtaking of vehicles on the roadway requires that the pass be safe, and that it also be reasonable and prudent.  Trooper Pelster did not feel the pass was reasonable and prudent.  (TR. 30.)  Trooper Pelster stated that when Ms. Bailey pulled in front of the semi, she put the semi into a following-too-close position.  (TR. 30.)  He testified that Ms. Bailey was approximately two car lengths in front of the semi after she pulled in front of it, but that she was able to increase this distance once she changed lanes due to a speed difference between her vehicle and the semi.  (TR. 31.)  Trooper Pelster stated that being two car lengths in front of another driver is not a safe distance.  (TR. 31.)

Trooper Pelster acknowledged that when Ms. Bailey overtook the semi-truck, she used her blinker and went back into the right lane.  (TR. 109.)  He further acknowledged that the semi driver did not stop, hit the brakes, hit the horn, or take any other evasive action to indicate that the vehicle that just passed him and came back into his lane of travel did so in an unsafe manner.  (TR. 113.)  Trooper Pelster also stated that any testimony he gave as to time and distance of Ms. Bailey's vehicle and/or the semi was based on his own estimations.  (TR. 105-106.)  Trooper Pelster did not use a stopwatch or any other measuring device to verify his estimations. (TR. 31.)

2

After observing what he thought to be a traffic violation for an improper pass, Trooper Pelster activated his lights and Ms. Bailey pulled over. (TR. 32.) Trooper Pelster approached the passenger side of Ms. Bailey's vehicle and retrieved her documents, which included a temporary paper license from Utah and the rental contract for the vehicle. (TR. 33.) There was no one else in Ms. Bailey's vehicle, other than a very large dog. (TR. 33.) Trooper Pelster told Ms. Bailey he was going to issue her a warning ticket and had her accompany him back to his cruiser. (TR. 33; Ex. 1.) There, Trooper Pelster created an electronic warning for the violation, ran Ms. Bailey's license through Lincoln communications and checked her criminal history. (TR. 33.)

While in the cruiser waiting for information from dispatch regarding the license and criminal history check, Trooper Pelster asked Ms. Bailey questions about her husband, her destination, where she was traveling from and the reason for her travel. Ms. Bailey informed Trooper Pelster that her husband was at home working and that she was traveling from Indianapolis to Salt Lake City. She told him she had been in Indianapolis to visit a friend. (TR. 34-35.) Trooper Pelster testified that he was concerned by Ms. Bailey's answers because the rental contract indicated that she was in Indianapolis for a very short period of time. (TR. 35.) Ms. Bailey rented the vehicle on August 26, 2016, at 9:00 p.m. and the traffic stop occurred on September 1, 2016. (TR. 36.) Ms. Bailey also told Trooper Pelster that she had only been in Indianapolis for one day. (TR. 36.) Trooper Pelster was further concerned because Ms. Bailey was coming from a drug distribution city, Indianapolis, and traveling back to a drug transportation hub, Salt Lake City. (TR. 39.) Additionally, Trooper Pelser was troubled because the rental vehicle that Ms. Bailey was driving, a Mercedes SUV, was large for someone traveling alone and was a high-end rental that cost a little over $1,600. (TR. 36-37.) Trooper Pelster also noted that Ms. Bailey was five months pregnant, yet drove 1600 miles alone. (TR. 38.)

During the stop, Trooper Pelster asked Ms. Bailey if she had ever been arrested and if she had ever been on probation or parole. (TR. 37.) Ms. Bailey indicated she was arrested once for a DUI, but was not jailed. (TR. 37.) However, the response Trooper Pelster received from dispatch about Ms. Bailey's criminal history did not match what she told him. (Tr. 37-38.)

3

Dispatch indicated that in addition to the DUI, Ms. Bailey had a past assault charge and a burglary charge that was reduced to petty theft.  (TR. 38.)

Trooper Pelster testified that Ms. Bailey's demeanor during their interaction in the cruiser was very polite, and that she was soft spoken and talkative.  (TR. 39.)  Still, Trooper Pelster felt Ms. Bailey was avoiding conversation about her trip because she would answer his questions and then change the subject.  (TR. 40.)  Trooper Pelster also believed that Ms. Bailey was nervous and exhibited a rapid heartrate.  (TR. 67, 71.)

At approximately 12:51 p.m., Trooper Pelster returned Ms. Bailey's documents to her and gave her a warning ticket.  However, he did not tell her she was free to go.  (TR. 42.)  Instead, he waited for Ms. Bailey to reach for the door handle of the cruiser to leave, and then asked her if he could take some additional time to ask her more questions, which Ms. Bailey agreed to do.  (TR. 42-43.)

Trooper Pelster asked Ms. Bailey additional questions about her travel.  (TR. 43.)  Trooper Pelster briefly went over the rental contract and pinned down that she was only in Indianapolis for one day and had driven four days.  (TR. 43.)  It took her two days to drive to Indianapolis and it would have taken her another two days to drive back to Salt Lake City.  (TR. 44.)  Trooper Pelster asked Ms. Bailey if he could search her vehicle and she said no.  (TR. 45.)  Trooper Pelster then asked Ms. Bailey if she would remain at the traffic stop until he had a canine sniff the exterior of the vehicle.  (TR. 45.)  Ms. Bailey responded "something like, okay, but I wouldn't mind being on my way."  (TR. 45.)  After approximately 22 minutes, Trooper Pelster detained Ms. Bailey and called for a canine.  The dog arrived about 20 minutes later.  (TR. 45-46; Ex. 1.)  Ms. Bailey was allowed to return to her vehicle while they waited for the drug dog to arrive because she had a dog in her vehicle.  (TR. 68; Ex. 1.)

Trooper Pelster acknowledged that Ms. Bailey's comments to him regarding the running of a drug dog around her car did not amount to consent for the dog sniff.  (TR. 85.)  However, Trooper Pelster felt Ms. Bailey was engaged in criminal conduct because she was nervous, driving an expensive rental vehicle with out-of-state plates, her carotid artery was throbbing, she

was traveling alone, she had traveled 1600 miles while pregnant, she did not fly, there were food wrappers in the vehicle, she had a small amount of clothing with her, and she was coming from a drug source city to a distribution city. (TR. 70-77, 84.) Trooper Pelster also found the fact that Ms. Bailey had a large dog with her an indicator of criminal activity. He believed that she could have been trying to defeat law enforcement or canine indication by traveling with the dog. (TR.75.)

When the canine arrived, it alerted and during the ensuing search of the vehicle, money was found. Ms. Bailey was then taken to a State Patrol office in Lincoln, Nebraska, where, after a *Miranda* advisement, she made a statement to investigators.

## ANALYSIS

### A.      The Stop of the Vehicle

Trooper Pelster testified that he stopped Ms. Bailey because she did not leave enough room between her vehicle and a semi-truck when she passed the semi and got back into the right lane, in front of the semi. A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation. *United States v Andrews* 454 F.3d 919, 921 (8th Cir. 2006) (citation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*.

Trooper Pelster did not have probable cause to believe that Ms. Bailey committed a traffic violation. Nebraska Revised Statute § 60-6,133, which governs the overtaking and passing of vehicles, provides:

> (1) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall first give a visible signal of his or her intention and shall pass to the left of the other vehicle at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.

5

(2) The driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle and shall not increase the speed of his or her vehicle until completely passed by the overtaking vehicle . . .

Neb. Rev. Stat. § 60-6,133.  Trooper Pelster testified it was not safe for Ms. Bailey to pass and enter the semi's lane of travel because she did not have sufficient clearance.  He stated that Ms. Bailey should have allowed for two seconds between the vehicles before moving into the lane of the semi.  However, this is not a requirement of state law.

Nebraska law only required that Ms. Bailey not drive to the right side of the roadway until she was safely clear of the semi-truck.  The video clearly shows that Ms. Bailey used her turn signal when moving from the right lane to the left lane, passed the semi in the left lane and used her turn signal to move back into the right lane.  As acknowledged by Trooper Pelster, the semi driver did not apply the brakes, honk the horn, or take any type of evasive action due to Ms. Bailey's passing of the semi.  (TR. 113.)  The video, which is the best evidence, shows that Ms. Bailey moved into the right lane, in front of the semi, when it was safe to do so.  Therefore, Ms. Bailey did not violate Nebraska law when she passed the semi and there was no reason to stop her vehicle.

Trooper Pelster did not have probable cause to stop Ms. Bailey's vehicle.  Therefore, the evidence obtained as a result of that illegal traffic stop is tainted and should be suppressed. *Wong Sun v. United States,* 371 U.S. 471 (1963).

## B.      Continued Detention for Drug Dog to Arrive

The Court has found there was no probable cause to stop Ms. Bailey's vehicle.  However, even assuming there was probable cause to stop Ms. Bailey for a traffic violation, suppression would nevertheless be proper because Trooper Pelster did not have reasonable suspicion to continue to detain Ms. Bailey for a drug dog to arrive and sniff the exterior of her vehicle.

Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the

necessary reasonable suspicion to justify a further detention. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Id*.

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). In assessing whether the requisite degree of suspicion exists, a court must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. *Id*. "The totality of the circumstances—the whole picture—must be taken into account." *Id*. "[B]oth innocent and criminal acts can create reasonable suspicion." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted). Factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136 (quotation omitted). However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." *Id*.

The Court finds that Trooper Pelster did not have reasonable suspicion to detain Ms. Bailey while waiting for a drug dog to arrive on the scene. This conclusion is supported by the Eighth Circuit Court of Appeals' decision in *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). In *Beck*, the government argued that reasonable suspicion for Beck's renewed detention arose from the following seven circumstances: (1) Beck was driving a rental car which had been rented by an absent third party; (2) the rental car was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) there was no visible luggage in the passenger

compartment of the automobile; (5) Beck was nervous; (6) Beck was traveling from a drug source state to a drug demand state; and (7) the officer did not believe Beck's explanation for his trip.    The Eighth Circuit found that these seven factors, whether viewed individually or in combination, did not generate reasonable suspicion for Beck's detention.

The *Beck* court found there was nothing inherently suspicious in Beck's use of a rental vehicle, even though it was rented by a third person.  The court reiterated that it had previously found that out-of-state plates are consistent with innocent behavior and not probative of reasonable suspicion.  The court further found that the mere fact that the vehicle was registered and licensed in California, an alleged "source state" for drugs, was a weak basis upon which to suspect criminal activity.    Additionally, the court indicated that the presence of fast-food wrappers in Beck's car was consistent with innocent travel, such that, in the absence of contradictory information, it could not reasonably give rise to suspicion of criminal activity.  The court also found that it is not unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.  Moreover, the court noted that although unusual or suspicious travel plans may give rise to reasonable suspicion, there was nothing suspicious about Beck's explanation that he was traveling to seek employment.

In the case at hand, the government maintains that reasonable suspicion for Ms. Bailey's detention existed because she had only stayed in Indianapolis for one day, she was coming from a drug distribution city and traveling back to a drug transportation hub, the rental vehicle that Ms. Bailey was driving was large for someone traveling alone and was a high-end rental that cost a little over $1,600, she was nervous, she had traveled 1600 miles while pregnant, she did not fly, there were food wrappers in the vehicle, she had a small amount of clothing with her, and she failed to report her entire criminal history.  Trooper Pelster also found the fact that Ms. Bailey had a large dog with her an indicator of criminal activity.

The Court finds that none of these factors, individually or taken together, give rise to reasonable suspicion.  Although Ms. Bailey had rented a high-end vehicle, there was nothing unusual about the rental agreement.  The vehicle had out of state plates, but this would not be uncommon for the area and/or traveling on the interstate.  Although Ms. Bailey was traveling by

herself, this circumstance is not uncommon in this day and age. In addition, Ms. Bailey's explanation that her husband was not with her because he had to work was not unreasonable and Trooper Pelster had no information that this was not true. The fact that Ms. Bailey was leaning back in her seat is easily explained due to Ms. Bailey being five months pregnant and very tall. Ms. Bailey was coming from a highly visited state and going to a highly visited state. Ms. Bailey had food wrappers in the car, but this would be consistent with traveling 1600 miles. Ms. Bailey appeared nervous to Trooper Pelster, which would be normal and Trooper Pelster had never met Ms. Bailey so he does not know her usual demeanor. Ms. Bailey explained her travel plans and her explanation did not waiver. Ms. Bailey also explained that she did not fly because airlines would not take her dog because it is too big. Given the size of the dog, this is a reasonable explanation. It is also clear from the video that the dog belonged to Ms. Bailey. She was very concerned about the dog throughout the stop and subsequent detention. Trooper Pelster also indicated that he thought Ms. Bailey was being evasive about her trip because she would answer his questions and then move on to something different. The video does not reflect this. The video reflects a normal course of conversation.

Ms. Bailey, in the additional conversation she had with Trooper Pelster following completion of the traffic citation portion of the stop, was asked about the two additional criminal charges that she did not report to Trooper Pelster. Ms. Bailey acknowledged these criminal charges and explained them. Trooper Pelster asked her about a burglary charge, which Ms. Bailey explained was a petty theft when she was 18 years old. Trooper Pelster also asked Ms. Bailey about a battery charge, which Ms. Bailey explained occurred when she was 19 or 20 years old. Ms. Bailey, at the time of the traffic stop, was 32 years old. Therefore, at the time of the stop, those additional charges were approximately 12 and 14 years old. Due to the length of time between those offenses and the traffic stop at issue, the undersigned cannot say that Ms. Bailey's failure to advise Trooper Pelster of the charges was inconsistent with innocent behavior. *See United States v. Jones,* 269 F.3d 919, 928 (8th Cir. 2001) (finding that police officer did not have reasonable suspicion to justify continued detention of the defendant where the defendant denied, but later admitted, having criminal convictions because the court could not "perceive the connection between an inconsistent answer regarding prior minor theft arrests that occurred four to five years ago and suspicion of interstate narcotics trafficking"). Based on the totality of the

9

facts of this case, the Court cannot find the Trooper Pelster had reasonable suspicion to detain Ms. Bailey.

Trooper Pelster's detention of Ms. Bailey beyond the point necessary to complete the traffic citation exceeded the scope of the initiated traffic stop. The extended investigative detention was unsupported by a reasonable, articulable suspicion that criminal activity was afoot and therefore violated Ms. Bailey's Fourth Amendment right to be free from unreasonable seizure. The evidence obtained in this case is tainted as a result of this unlawful detention and should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963). Therefore, the undersigned will recommend that Ms. Bailey's Motion to Suppress (Filing No. 25) be granted.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 25) be granted.

Dated this 17th day of July, 2017.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

10